QUESTION: Do the provisions of Ch. 513, F.S., apply to sporting events, such as the annual Daytona Beach 500 Speedway Race, so as to require the speedway facilities to qualify to obtain a permit under such chapter in order to allow those patrons who have paid admission to the speedway event to reside overnight, or for several nights, on the speedway facilities in their individual automobile trailers, automotive trailers, and house trailers?
SUMMARY: Chapter 513, F.S., regulating trailer camps, and the rules and regulations of the Division of Health of the Department of Health and Rehabilitative Services adopted under the authority of ss. 513.05 and 381.031, F.S., do not apply to parking lots and areas maintained in connection with sporting events, such as the annual Daytona Beach 500 Speedway Race. Under ss. 513.03-513.04, F.S., a tourist camp or trailer camp may not be maintained without a permit from the Division of Health of the Department of Health and Rehabilitative Services, pursuant to an application showing the location of the proposed camp, the approximate number of persons or trailers to be accommodated, the probable duration of use, "and any other information the division of health may require." As amended in 1939 by Ch. 19365, 1939, Laws of Florida, s. 513.01 defines "trailer camp" as follows: A trailer camp is a place set aside and offered by any person or municipality, most generally to the transient public, for the parking and accommodation of two or more automobile trailers which are to be occupied for sleeping or eating, for either a direct money consideration or for indirect benefit to the owner in connection with a related business. Under s. 513.05, F.S., the Division of Health is given general supervision of the "health and sanitary conditions of all tourist and trailer camps" located in this state and is authorized to adopt "such rules and regulations pertaining to the location, construction, equipment and operation of such camps as may be necessary." And under s. 381.031(1)(g)3., id., the division may adopt rules and regulations consistent with law regulating, among others, "trailer, tourist, recreation and other camps offering accommodations to the public." Pursuant to the authority of ss. 513.05 and 381.031, supra, the division adopted Chapter 10D-26, Florida Administrative Code, to regulate "[s]anitary practices relating to construction, operation and maintenance of trailer parks." Rule 10D-26.02, F.A.C., tracks the statutory definition of "trailer camp" in defining "trailer park" but, as revised in 1971, elaborates upon it by defining "trailer" to include mobile homes, travel trailers, and "recreational units" such as pick-up coaches, motor homes, camping trailers, auto campers, and "other travel units" designed for travel, recreation and vacation uses not specifically described. Under the rules, a trailer park must provide toilet and bathing facilities, a water supply system, and sewage disposal facilities, as specified therein, Rules 10D- 26.08-26.10, and must comply with the density, separation, and space requirements made by the rules. As to "recreational units," the density must not exceed twenty-five units per acre of gross site, and each unit must be separated from each other and from other structures by at least 10 feet. Rule 10D-26.07(5). Each trailer park must be under the supervision of a competent manager at all times, and an office must be provided for the use of the park manager. Rule 10D- 26.17. All patrons are required to register upon entrance to the trailer park. Rule 10D-26.19. The registration records "shall be preserved and available upon request of authorized persons" and must include . . . the names and addresses of all trailer coach occupants; the make, model and license number, including the year of issuance of the license, of each motor vehicle and trailer coach; the state, territory or county issuing the trailer license and the dates of arrival and departure of each trailer coach. Under s. 513.10, id., violations of the statute and of the regulations adopted thereunder are subject to the penalties provided by s. 381.411, id. This means that violators are guilty of a misdemeanor of the second degree punishable by imprisonment for not more than 60 days or a fine of five hundred dollars, or both. In 1939, when the statute was amended to provide for the regulation of trailer camps as well as tourist camps, most of the recreational units which patrons of various sporting events now use to attend such events were not even in existence — at least, not in any appreciable quantity; and it seems clear that the framers of the statute could not have intended to include the comparatively small recreational units commonly used to attend such events — and which may be parked in a regular parking space on the street or in a parking lot — in the term automobile trailer in providing for the regulation of trailer camps. Nor does it seem that the rules were intended to include the occasional and incidental parking of such vehicles at a sporting event or other form of entertainment such as a football game, county fair, rodeo, music festival, circus, or the races. The mere recital of the requirements for conducting a trailer park negative any such intent on the part of the framers of the rules. For example, the density and separation requirements for recreational units appear to be unrelated to the type of parking which is ordinarily required for spectator-sport events; and the requirement that a trailer park must be under the supervision of a competent manager "at all times," with an office provided for his use, could not reasonably be applied to the parking lots or other areas which are provided for the use of patrons of sporting events four or five times, or less, a year. Nor can it reasonably be inferred that the framers of the rules intended that persons who attend a football game or other similar spectator sport in a camper or pick-up coach or other similar recreational vehicle, and have lunch in the vehicle while waiting for the game to begin or spend the night, must register with the owner or operator of the sporting event and supply the other information required by Rule 10D-26.19, which information must be preserved by the owner or operator of the event as a permanent record. And, as noted above, the 1939 statute, authorizing the division to adopt rules and regulations pertaining to the location, construction, equipment and operation of a trailer camp, could not reasonably have been so intended. It is well settled that a statute should be interpreted so as to avoid an absurd result, Sharon v. State, 156 So.2d 677 (3 D.C.A. Fla., 1963), and to comport with the Constitution if it is susceptible of more than one construction. Overstreet v. Blum, 227 So.2d 197 (Fla. 1969). Statutes imposing a penalty are subject to the rule of strict construction and should not be construed to include anything beyond their letter even though within their spirit. Conner v. Alderman, 159 So.2d 890 (2 D.C.A. Fla., 1964). The same rules would seem to be equally applicable to the construction of administrative rules and regulations — in addition to the fundamental rule that an administrative agency's rule-making power must find its source in some statutory or constitutional authorization. Applying these rules of construction to the question here presented, it can be concluded only that the statute authorizing the regulation of trailer camps and the rules adopted pursuant thereto could not have been intended to apply to parking lots and other areas which are in use only a few times a year — or in some cases, only once or twice a year — to provide patron parking in connection with some sporting event, even though the patrons who attend in campers or other similar recreational vehicles may eat lunch or dinner in the vehicle and, occasionally, spend the night before or after the event in the vehicle. While the overnight parking situation normally occurring at various types of sporting events — and, particularly, at some of the sporting events at the Daytona International Speedway — might be such as to justify the exercise by the division of its rule-making power under s. 381.031(1)(g), supra, it seems clear that the regulations should be adopted with particular reference to the circumstances under which overnight parking takes place in connection with a particular sporting event. And, insofar as regulations affecting the Daytona Beach Speedway are concerned, such regulations should not only be reasonably related to the public purpose sought to be achieved by the division in exercising its rule-making power but also be consistent with and not detract from the public purpose served by the speedway facilities in increasing trade by attracting tourists to the area and in providing recreation for the citizens of that area. See State v. Daytona Beach Racing Rec. Fac. Dist., 89 So.2d 34 (Fla. 1956). Your question is, therefore, answered in the negative.